# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 11, 2006

## STATE OF TENNESSEE v. MARCUS D. HAYES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-06160     Paula Skahan, Judge**

---

**No. W2005-01597-CCA-R3-CD  - Filed May 4, 2006**

---

The defendant, Marcus D. Hayes, was indicted for premeditated first degree murder. He was convicted by a jury of the lesser-included offense of second degree murder. He was sentenced to twenty-three years in confinement. On appeal, the defendant challenges the admissibility of his statements to police and the sufficiency of the convicting evidence. After review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Anthony Helm, Memphis, Tennessee, for the appellant, Marcus D. Hayes.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jimmy Lammey and Alexia Fulgham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  FACTS

The proof at trial reflects that the victim, Felipe Hernandez, was shot and killed on March 29, 2003. At trial, Thomas Dunlap, minister of the Hampton Memorial United Methodist Church in Millington, testified that on March 29, 2003, around 8:30 p.m., he observed a car parked in a field across the street from the church. He then noticed the same car pull into the church parking lot. Five minutes later, while inside his home, Mr. Dunlap heard two or three gunshots and looked out the front window. From the front window, he saw a black male rummaging through the backseat of the car. Mr. Dunlap then heard more gunshots from the back of his home. He went to the back of his home and looked out the window. From the window, he saw the victim and another man "having a commotion," which resulted in the victim being shot. After calling 911, he returned to the back

window and saw the victim holding his neck, saying "they're killing me, [a]nd I've been shot." Mr. Dunlap also saw a gunman, wearing a dark colored puffy jacket, run around the house carrying a shotgun in pursuit of the victim. After the gunman and the victim disappeared from view, Mr. Dunlap heard "more gunshot[s], but louder gunshots." Mr. Dunlap then saw a person run through his front yard carrying what he thought was a shotgun. However, Mr. Dunlap could not tell if the person carrying a shotgun in the front yard was the gunman he saw in the backyard.

Bobbie Studdard testified that around 8:30 p.m. he and his wife heard noises outside. Shortly thereafter, someone started banging on his front door. After he opened the door, he saw the victim bleeding. The victim, who was bleeding, said he had been shot and requested help. At that moment, another man, wearing a black puffy jacket with a pulled-up hood, appeared around the corner of the house with a shotgun and shot the victim. In response, Bobbie Studdard shut the door and went for his own gun. While he was getting his gun, he heard more shots and saw someone running across his lawn towards the Methodist church.

Michael Studdard testified that around 8:30 p.m. he heard gunshots, which sounded like a small caliber pistol, fired in rapid succession. When he looked outside, he saw a "smaller person" wearing a "big flowing coat" running across the back of the lot. Moments later, he saw the victim run up to the front porch of his parents' house and bang on the door. According to Michael Studdard, the victim was calling for help. As Michael Studdard approached the victim, a smaller black male came around the corner of the house and shot the victim. At that time, Michael Studdard ran back into his house. He then heard more shots and the squealing of tires. He looked outside and saw a dark colored car drive off. Michael Studdard estimated that the smaller black male weighed about 150 pounds.

Derrick and Sonia Drewery both testified that they lived near the Studdards and heard gunshots. Mr. Drewery stated that the first gunshots sounded faint, but later, he heard "shotgun blasts in succession." After looking outside, Mr. Drewery saw two guys running around in the yard two houses down. After Mr. Drewery left his house, he saw a black male standing over another man. The black male was screaming "give me your keys." According to Mr. Drewery, the black male was wearing a white t-shirt, blue jeans, and tennis shoes. He was medium build, about five-eleven and about 175 pounds. When Mr. Drewery approached the Studdard's yard, he asked what was going on, and the victim responded, "they just shot me." A few seconds later, a black male wearing a "large overstuffed coat" approached the victim with a shotgun. Mr. Drewery stated that he ran back to his house to avoid being shot, heard a shot, turned around and saw the two black males run to the car and drive off. Mrs. Drewery's testimony was similar to Mr. Drewery's testimony with the exception that Mrs. Drewery observed the gunman wearing an overstuffed coat with a hood. Mrs. Drewery also testified that she believed the gunman was smaller than the other man.

Donald Kyles testified that he had known the defendant for about eight years. Kyles stated that the defendant introduced him to the victim the day before the shooting. According to Kyles, he and the defendant hatched a plan to rob the victim of money and drugs. In order to convince the victim to join them, the defendant asked the victim if he wanted to help them rob someone they had

kidnapped earlier and placed in a small abandoned shed in Millington. The victim agreed and brought a shotgun with him. Kyles recalled that the victim handed the shotgun to the defendant who placed it in the backseat of the victim's car.

Kyles testified that the victim parked the car in the church parking lot because he could not drive the car into the field where the shed was located. As the defendant and the victim walked toward the shed, Kyles began searching the victim's car for money and drugs to steal. He then heard gunshots. According to Kyles, the defendant ran back to car, pointed a pistol at him, grabbed the "big gun" and ran after the victim. The defendant then shot the victim on the porch of a house and yelled at Kyles to get the keys. Kyles stated that he thought the defendant would shoot him if he did not get the keys, so he ran over to the victim and got the keys from the victim's pocket. Kyles and the defendant left the area with the victim's car. While they were driving away, the defendant asked Kyles why he did not help shoot the victim and warned Kyles not to cross him. Later, they abandoned the victim's car on Bickford Street. Kyles described the victim's car as a Grand Marquis, brownish in color.

According to Kyles' testimony, he was wearing black jogging pants and a gray shirt, and the defendant was wearing a black bubble coat with a hood. Kyles denied seeing any weapon other than the victim's shotgun until the defendant pulled the pistol on him. On cross-examination, Kyles insisted that he did not know the victim was going to be killed.

Police Officer D. Bowling testified that he responded to the shooting and began an investigation of the crime scene. At the crime scene, Officer Bowling observed the victim lying on the porch of the Studdard's residence. According to Officer Bowling, the Studdards and the Drewerys were interviewed and evidence was collected. Police Sergeant Scott Wright testified that he participated in the investigation. He recalled that the police found the victim's vehicle parked on Bickford Street. He also recalled that the defendant's arrest ticket listed the defendant as five feet, four inches tall and weighing 140 pounds. Police Sergeant John Mills testified that he participated in the crime scene investigation. He recalled that police recovered four shotgun shells from the crime scene. He also recalled that a black puffy jacket was recovered from a dumpster. However, he could not recall who led him to the jacket.

Police Detective Ray Sides testified that he led the investigation into the victim's homicide. Detective Sides recalled that several days after the shooting, Donald Kyles gave a statement indicating his involvement. After talking with Kyles, Detective Sides interviewed the defendant. Prior to the interview, Detective Sides advised the defendant of his *Miranda* rights, and the defendant signed a waiver of rights form. Detective Sides stated that the interview with the defendant was recorded. The recording was played before the jury and a transcript of the recording was admitted as an exhibit in the case.

According to the defendant's recorded statement, the defendant and the victim met in jail three years ago. After they both got out of jail, they started doing business together. Later, the victim began dating the defendant's sister and living at the defendant's mother's house. The

defendant began transporting drugs for the victim. While making a drop-off, he was forced to throw away a large amount of dope because the "police got behind him." He was eventually stopped by police and went to jail for nine months for violating his probation. When he got out of jail, the victim told him that he expected reimbursement for the lost drugs. The victim told him to "sell his dope for him for free," otherwise, the victim would harm the defendant and his family. The victim also asked the defendant to shoot his boss, but the defendant told the victim that he would not do it and called the victim's boss to warn him. The defendant also asked the victim's boss for $1,500 to move his family. The defendant taped the conversation, but the victim somehow got a hold of the tape. The victim then told the defendant that if he said anything, the victim would kill the defendant and his family. The victim also asked the defendant if Kyles would shoot his boss.

According to the defendant's recorded statement, the victim called the defendant on Saturday and told him to come to the house and to bring Kyles. The victim wanted the defendant and Kyles to accompany him to pick up drugs from an abandoned shed in a field in Millington. The victim asked the defendant to help him load the guns. The victim had a 12 gauge shotgun and a .25 caliber automatic pistol. After the defendant put the shotgun in the backseat with Kyles, they all drove to Millington in the victim's car. When they reached the field where the abandoned shed was located, the victim asked the defendant to help him "get the dope," and told Kyles to stay in the car. When they reached the shed, the victim pushed the defendant into the shed and told the defendant that he was going to die for trying to set him up. They started fighting. During the fight, the victim dropped the pistol, and the defendant picked it up and shot the victim. The victim ran out of the shed and towards some houses. The defendant ran to the car, gave the .25 caliber pistol to Kyles, and told Kyles that he was going to kill the victim because the victim tried to kill him. The defendant then grabbed the shotgun, chased after the victim, and shot him. Afterward, Kyles took the .25 caliber pistol and got the keys from the victim. The defendant thought he heard more gunfire. Later, Kyles drove the victim's car, dropped the defendant off, and got rid of all the evidence including the guns and the clothes they wore. The defendant claimed that Kyles wore a big black bubble jacket and he wore a small black bubble jacket.

Detective Sides stated on cross-examination that the police never found any spent shells from a small-caliber handgun and recovered no weapons. Detective Sides denied telling the defendant that he could avoid a murder charge if he confessed. He also denied using any force or threats to get a confession from the defendant.

Dr. Teresa Campbell, a forensic pathologist, testified that the victim died of multiple gunshot wounds. Dr. Campbell explained that the victim's injuries indicated he was shot with both a shotgun and a smaller-caliber weapon. Dr. O.C. Smith, another forensic pathologist, testified that several bullets recovered from the victim's body were, in his opinion, .22 caliber bullets.

Odell Thorton testified that he was the victim's employer for about three years. He and the victim had a good relationship. The victim called him "Dad" and often socialized with him after work. Mr. Thorton stated that one time the victim stayed with him for three weeks. Mr. Thorton also stated that he knew the defendant. Mr. Thorton recalled receiving a phone call from the

defendant on March 26, 2003. The defendant explained that he was out of jail. He then told Mr. Thorton that the victim had placed a bounty on Mr. Thorton's head. The defendant claimed that he had a tape recording of it and asked Mr. Thorton to meet him somewhere. The defendant also asked Mr. Thorton to bring $1500 in exchange for the tape and information on the victim's whereabouts. Mr. Thorton told the defendant he would think about the defendant's proposal and get back in touch with him. Mr. Thorton then called the Collierville Police Department.

Mr. Thorton testified that the victim never threatened him. Mr. Thorton also testified that the victim had a good reputation in the community. Mr. Thorton stated that he never received a copy of the tape revealing that the victim had put a bounty on his head. Mr. Thorton recalled that he did not give much credence to the defendant's story about the bounty and thought the defendant was trying to make some money after getting out of jail. On cross-examination, Mr. Thorton testified that he reclaimed a vehicle from the victim after the victim stopped making payments.

Detective Brian Kiersey of the Collierville Police Department testified that after being contacted by Mr. Thorton, he called the defendant and asked to hear the tape. The defendant refused to meet and said he would contact him later. The defendant never did. The next day, Detective Kiersey called the defendant again. At this time, the defendant told him that he was with the victim and could not meet. Detective Kiersy stated that the defendant appeared evasive when contacted. Detective Kiersey recalled that over the weekend he heard news that the victim had been killed.

Samantha Hayes, the defendant's sister, testified that Donald Kyles had a bad reputation for telling the truth. She stated that the black puffy coat belonged to Donald Kyles, and she had never seen her brother wear Kyles' coat. According to Ms. Hayes, the victim was dating her sister and staying at her mother's house. Ms. Hayes declared that the victim had a poor reputation for peacefulness. Sidney Hayes, the defendant's brother, testified similarly. Sidney Hayes added that the victim used to drive a truck owned by Mr. Thorton, and the victim got angry when Mr. Thorton took the truck.

The defendant testified that he knew the victim because the victim was living with his family. The defendant stated that he delivered drugs for the victim. The defendant said that he had been friends with Donald Kyles for many years. The defendant also mentioned that the victim introduced him to Mr. Thorton. The defendant said the victim and Mr. Thorton had a good relationship until Mr. Thorton took a truck from the victim.

The defendant testified that he was arrested while attempting to drop off drugs for the victim. He got rid of the drugs before he was stopped but ended up in jail as a result of a probation violation. When he got out of jail, he was told by the victim that Mr. Thornton had taken the victim's truck. The victim was angry about the situation and asked the defendant to kill Mr. Thorton. The victim told the defendant to kill Mr. Thorton because the defendant owed the victim money for the drugs he had thrown away. The defendant did not want to kill Mr. Thorton but thought that Kyles might want the job. Later, the defendant and Kyles hatched a plan to fool the victim into believing that Kyles would kill Mr. Thorton. The defendant would tape the victim setting up the job with Kyles,

then the defendant and Kyles would rob the victim of drugs and ask Mr. Thorton for $1500 in exchange for the taped conversation. Ultimately, the defendant planned to use the tape as evidence to send the victim to jail for trying to kill Mr. Thorton. However, after the defendant taped the conversation and called Mr. Thorton, the tape "came up missing."

The defendant testified that when the police initially called him, he told them that he had a tape but it was missing. Subsequently, the defendant learned that Kyles told the victim about the tape and somehow the victim got the tape. The victim then approached the defendant and told the defendant that he knew the defendant was trying to set him up. The victim told the defendant that he expected the defendant to kill Mr. Thorton; otherwise, the victim would kill the defendant's family. According to the defendant, he did not call the police back because the victim had discovered his plan and threatened his family the day before the shooting.

The defendant testified that the day of the shooting, the victim called him and told him to be home. Later that evening, the victim woke the defendant from sleep and told the defendant to follow him out to his car. The defendant got into the car and observed Kyles sitting in the backseat, wearing a "buff," overstuffed jacket and holding a shotgun. The defendant asked about the shotgun, and the victim responded, "[w]e going to pick up some dope." The defendant then observed the small .25 caliber pistol tucked in the victim's pants. While en route, the victim stopped at a gas station and went inside. The defendant asked Kyles what was going on and Kyles said, "everything is straight, man. He fixing to pay me the other half about killing his boss man."

The defendant testified that the victim drove to the field where the abandoned shed was located but had to park the car in the church parking lot because the field was too muddy. After parking the car, the victim asked the defendant to accompany him to the shed. The defendant complied, and he and the victim walked across the street towards the shed. Kyles stayed behind in the car holding the shotgun. When the defendant and victim reached the shed, the victim "put the gun against [the defendant's] head and told [him], mother f**ker you trying to set me up. Donald [Kyles] already told me." The defendant denied the victim's accusations, but he and the victim started to fight. While fighting, the gun dropped, and the defendant picked up the gun and started shooting. The victim fled out of the shed. The defendant stated that he "shot the gun up" and saw the victim get up and run back to the car. At the car, the defendant told Kyles what happened. While talking to Kyles, the defendant and Kyles saw the victim knocking on the door of Studdard's house. The defendant asked Kyles "where the keys at?" Kyles responded by jumping out of the car and shooting the victim with the shotgun.

The defendant testified that he shot at the victim with the .25 caliber pistol because he was afraid for his life. He also stated he was not sure if he hit the victim when he started shooting because the shed was dark. The defendant denied shooting the victim with the shotgun and stated that he took off his jacket before taking the keys from the victim. The defendant asserted that he wore a white t-shirt underneath his jacket. The defendant said he drove the victim's car from the church parking lot because Kyles was not familiar with Millington. The defendant claimed that he

lied in his original statement to police because he and Kyles had made a pact not to tell on each other. The defendant said that he confessed because police choked him and threatened him.

Based upon the evidence presented, the jury found the defendant guilty of second degree murder. The trial court sentenced the defendant to twenty-three years in confinement.

## II. ANALYSIS

### A. Motion to Suppress

The defendant first challenges the admissibility of his statements to police. Specifically, the defendant argues that the trial court erred in admitting his statements to police because they were obtained in violation of his constitutional rights. We disagree.

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, government authorities are prohibited from using statements made by the accused during custodial interrogation unless the accused has been previously advised of his or her constitutional right against compulsory self incrimination and right to an attorney, and the accused knowingly and voluntarily waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily and knowingly made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, coercive police activity is a necessary predicate to finding that a confession is not voluntary." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted).

When reviewing the trial court's decision on a motion to suppress, this court conducts a de novo review of the trial court's conclusions of law and application of law to facts. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).

At the suppression hearing, Detective Sides testified that the defendant was interviewed as a suspect. Prior to the interview, Detective Sides advised the defendant of his *Miranda* rights, and the defendant signed and dated a waiver of rights form. The defendant told Detective Sides that he had a sixth grade education. As a result, Detective Sides read the waiver of rights form to the defendant in addition to allowing the defendant to read it.

Detective Sides testified that no promises or threats were made to the defendant. According to Detective Sides, the defendant told several conflicting stories before admitting that he shot the victim. However, around 4:00 p.m. the defendant gave a statement admitting guilt, and this statement was recorded. Detective Sides stated that before the defendant gave this statement, the defendant was again advised of his *Miranda* rights, to which he responded, "Yes sir. It'll help me out?" Detective Sides explained that the defendant's response "It'll help me out" related to an earlier conversation about getting the guilt off the defendant's chest, letting everyone know what happened, and closure. Detective Sides reiterated that no promises were made to the defendant in exchange for giving a statement.

The defendant testified that during his interview he initially told the police officers that he "didn't do nothing." However, he gave a statement admitting that he shot the victim with a shotgun after "they choked [him] out." The defendant also said another officer told him that he was not going to get a murder charge; he would do three years and go home. According to the defendant, the police stopped the tape recording of the interview in order to choke him and call him names. Consequently, he was afraid and "wanted to get away from all three of [the officers]."

The defendant testified that he ended up giving an untruthful statement because the police promised "I do three years and I get out." The defendant claimed he could not read and denied understanding his *Miranda* rights. On cross-examination, the defendant admitted that he initially lied to police about his knowledge of the crime. The defendant also admitted that he had been arrested "a whole lot of times" and "pled guilty a lot of times." Still, the defendant denied understanding his *Miranda* rights because he had "never been in no detective office before [and he] ain't never been no murder charge before." During cross-examination, the defendant admitted that he shot the victim, but he denied shooting the victim with the shotgun.

At the conclusion of the hearing, the trial court noted that the defendant indicated he understood his *Miranda* rights by signing the waiver of rights form and by verbal acknowledgment prior to giving his statement to police. The trial court also noted that the defendant had a past criminal history and arrest record. The trial court further noted that the defendant responded well to questions posed by both attorneys at the suppression hearing. Therefore, the trial court found that the defendant understood his *Miranda* rights. In addition, the trial court found no credible evidence that the defendant was coerced by police.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings that the defendant knowingly and voluntarily waived his *Miranda* rights and freely gave statements concerning his involvement in shooting the victim. Accordingly, we hold that the trial court properly denied the defendant's motion to suppress, and this issue is without merit.

## B. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the convicting evidence. Specifically, the defendant asserts that the evidence was insufficient because "the only proof of who murdered [the victim] comes from the illegally obtained statement of the defendant on May 1, 2003."

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

In Tennessee, a conviction may not be based solely upon a defendant's confession. *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000) (citing *Ashby v. State*, 139 S.W. 872, 875 (Tenn. 1911)). Additional corroborating evidence is required which, independent of the defendant's confession, tends to establish the *corpus delicti* of the offense charged. *Id*. The term *corpus delicti* refers to the body of the crime. *State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). To establish the *corpus delicti* for a homicide, the state must prove the death of a human being, and that someone is criminally responsible for this death. *See State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995). The *corpus delicti* may be established by both direct and circumstantial evidence. *State v. Ervin*, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986). Furthermore, the question of whether the state has sufficiently proven the *corpus delicti* is a question for the jury. *Id*. at 71.

While the *corpus delicti* cannot be based solely upon a defendant's confession, "[o]nly *slight* evidence of the *corpus delicti* is necessary to corroborate a confession and thus sustain a conviction." *Id*. at 72 (emphasis added). The corroborating evidence is sufficient to sustain a conviction if "it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951). "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

After considering the evidence in the light most favorable to the state, we conclude that a rational trier of fact could have found the defendant guilty of second degree murder. Contrary to the defendant's argument on appeal, his confession was corroborated by other independent evidence. As previously noted, the defendant's confession established that he shot the victim with a small-caliber handgun, then went to the victim's car, grabbed a shotgun, chased after the victim and shot the victim with the shotgun. In this case, the testimony of Donald Kyles corroborates the defendant's entire confession with little variance. In particular, Kyles testified that he heard gunshots, then observed the defendant grab the shotgun and shoot the victim. Also, several witnesses testified that the gunman was a smaller black male wearing a dark, puffy jacket. While the defendant testified at trial that Kyles shot the victim with the shotgun, the evidence established that the defendant was smaller and shorter than Kyles. Furthermore, the defendant's confession is corroborated by evidence establishing that the victim was shot with both a small caliber handgun and a shotgun and died from multiple gunshot wounds. Indeed, the defendant's own testimony at trial establishes that he shot the victim with a small caliber handgun. To sustain the defendant's conviction for second degree murder, the state was required to prove that the defendant knowingly killed the victim. Tenn. Code Ann. § 39-13-210(a)(1). In this particular case, the corroborating evidence sufficiently connected the defendant with the commission of second degree murder. Consequently, the defendant's confession was sufficiently corroborated and his sufficiency argument is without merit.

### III. CONCLUSION

We affirm the trial court's decision to admit the defendant's confession and conclude that the evidence was sufficient to support the defendant's conviction. Accordingly, the judgment of the trial court is affirmed.

_____
J.C. McLIN, JUDGE